1   Francis Malofiy, Esquire
2   Francis Alexander, LLC
3   280 N. Providence Rd. | Suite 105
4   Media, PA 19063
5   T: (215) 500-1000
6   F: (215) 500-1005
7   E: francis@francisalexander.com
8   *Pa. Supreme Court ID No. 208494*

9            United States District Court
10           Central District of California

11  _____

Stephanie Counts;          | No.: 2:14-cv-00396
        *and*              |
Shari Gold                 | Complaint Filed: January 16, 2014
        *Plaintiffs*       |
                           | **The Honorable Stephen V. Wilson**
        v.                 |
                           | *Plaintiffs' Response to Defendants Motion to*
Elizabeth Meriwether, et al., | *Dismiss Pursuant to FRCP 12(b)(6)*
        *Defendants*       |
                           | *Oral Argument: July 21, 2014*

12  _____

13         Plaintiffs' Response to Defendants'
14              Motion to Dismiss

15

16          Before examining access and substantial similarity, it must be noted that Defendants'

17  Motion to Dismiss is premature and fails to include the underlying *New Girl* scripts necessary for

18  an adjudication of this matter. For this reason alone, the Motion to Dismiss must be denied. The

19  problem arises from the fact that Defendants ask the Court to compare judicially noticed *New Girl*

20  DVDs to Plaintiffs' *Square One* scripts, but shockingly fail to address the actual copyrighted scripts

21  for *New Girl*, including the pilot named "Chick and Dicks." Logically, this Court cannot consider

22  substantial similarity in a motion to dismiss where it cannot even examine the underlying

23  screenplay Plaintiffs allege to be infringing. The Chicks and Dicks script is referenced repeatedly

by Plaintiffs in the First Amended Complaint and thus Defendants have no excuse for not including it in their analysis. In effect, Defendants are trying convince the Court to dismiss this case without affording the Court to opportunity to examine all the infringing material identified in the complaint; it is disingenuous for Defendants to file a motion to dismiss without even disclosing the existence of these scripts *which are necessary to decide this matter*.

In fact, this Motion to Dismiss should have never been filed. Defendant Elizabeth Meriwether finished her first draft of "Chicks and Dick" somewhere around October 2010; given that there has been rewrite *after* rewrite *after* rewrite of this script,[1] it is absolutely imperative that the **original script** written by Meriwether be compared to *Square One*.[2] But given that the first "Chicks and Dicks" draft has never been copyrighted, and cannot be judicially noticed, there is no way for the Court to compare the most pertinent *New Girl* script to *Square One*—at least in a motion to dismiss. Therefore, this motion to dismiss is fatally flawed and deficient in all respects as it should have never been filed; Defendants should have appropriately answered the Amended Complaint instead.

Plaintiffs therefore advance three primary grounds for denying this Motion to Dismiss:

(1) Defendants' motion to dismiss completely ignores the actual *New Girl* scripts, focusing entirely on the audiovisual derivative works

(2) Defendants' motion largely ignores access and its relationship to substantial similarity under the inverse ratio rule; and

(3) It is clear that *Square One* and *New Girl* are substantially similar no matter what standard or material is used.

---

[1] Commentary, by Defendants, in the DVDs judicially noticed by Defendants state that all *New Girl* scripts are changed and edited and rewritten in pre- and post-production, altering the original work before it is exploited.

[2] If just one or two of those scripts is determined to be infringing, the rest of the show must be held to be infringing derivative works.

In the event the Court happens to consider the substance of Defendants' Motion to Dismiss, Plaintiffs' claim is quite simple:  **Square One is not just substantially similar to *New Girl*, it is virtually identical.** Defendants "created" *New Girl* by copying Plaintiffs' protected expression. Moreover, unique to this case, it is undisputed that defendant WME's top management solicited Plaintiffs' scripts titled *Square One*, coverage was done,[3] and that WME's top management represents the producers and writers of the show *New Girl*.

It is shocking reading Defendants' Motion to Dismiss to see them blithely state "*New Girl* and *Square One* at most share the general idea of a woman moving in with three male roommates." Def. Brief, at p.16. It is apparent to Plaintiffs that there is absolutely no way Defendants could have read the Complaint if they actually hold such an opinion. The many similarities Defendants somehow overlook include the fact that *New Girl* and *Square One* are both works are about:

- a *late twenties early thirties* woman who moves in with *three* guys; the move is result of *break up* after her ex—*named Spencer—cheats* on her;
- the protagonist is *awkward* and *sexually inexperienced*;
- in each story the three male roommates have nearly *identical roles and personalities*;
- the *type-B bartender roommate* is the one who likes and eventually becomes *romantically involved* with the protagonist;
- life in each bachelor pad centers around an *L-shaped couch* and a *big screen television*; the fifth character is Plaintiffs' best friend named Cat Cook or Cat Cook (C.C.);
- the protagonist has casual sex for the first time in her life before deciding *she likes the bartender*;
- the bartender and protagonist eventually *share a passionate kiss*.

The totality of the similarities, elaborated below, is simply stunning and it defies logic that *New Girl* was created without Defendants drawing on and copying Plaintiffs' protected expression.[4]

---

[3] Coverage is a written evaluation by a talent agency of a script for potential exploitation, an evaluation that is then distributed internally by the agency. Few scripts receive coverage in the first place, and a script with coverage is far more likely to be developed.

[4] Plaintiffs also note that their treatment by the entertainment and legal establishment in Hollywood has been outrageous. Specifically, when Plaintiffs first learned *Square One* was being infringed by *New Girl*, they immediately retained counsel, since dismissed. Their former counsel advised them to

1   Plaintiffs' have attached a video analysis of *Square One* and *New Girl* as Exhibit A (Cards 1–17) to

2   illustrate the remarkable number of similarities between the two works.

3   Moreover, despite the fact that access is a crucially important element in any copyright

4   infringement claim, Defendants' motion sedulously ignores access, and it is obvious why: because

5   access in this case is quite clear. Access is important because it not only demonstrates that a

6   defendant relied upon a plaintiff's work, but, under the Inverse Ratio Rule, a greater showing of

7   access significantly lowers a plaintiff's burden in proving substantial similarity between the two

8   works at issue. Make no mistake, Defendants received Plaintiffs' scripts. Consider, defendant

9   William Morris Endeavor, the powerful talent agency at the center of this lawsuit:

10  ▪ Had a member of its board of directors, Adam Venit,[5] solicit *Square One* from Plaintiffs.
11  ▪ Performed coverage of the script.
12  ▪ WME worked with Plaintiffs for years to develop *Square One*.
13  ▪ WME's top television executives represent the defendants—Meriwether, Chernin,
14    Fox, Kasdan, Finkel, and Baer—who produce and write *New Girl*.
15  ▪ WME top television executives work with Adam Venit and had access to the *Square*
16    *One* scripts and coverage.
17  ▪ Chernin is a major producer who selected WME as his agent primarily because of its
18    ability to deliver him material for TV development.
19  ▪ WME's directors, partners, and executives gave the *Square One* scripts to Defendants
20    to rewrite and develop.

21  Given that Plaintiffs have pled a strong case for access not seen in most copyright cases, and given

22  that all well-pled facts must be accepted as true by the Court when deciding a Motion to Dismiss,

take a paltry $10,000 settlement offer from defendants Fox and WME regarding the claims at issue in this Complaint. Complaint at ¶¶12, 95. Plaintiffs had been told by their former counsel that the firm actually represented defendant Kasdan and his father, but that firm assured Plaintiffs, after taking their money, that there was no conflict. Clearly there was a conflict, and clearly the push to have Plaintiffs settle their case for a shockingly low amount of money was improper.

[5] Venit is one of nine directors of the fourth largest talent agency in the world, along with Rock Rosen, the man who represents defendant Chernin and his companies.

Plaintiffs' burden in establishing substantial similarity is lowered for purposes of this motion under the inverse ratio rule.

## I. DEFENDANTS' MOTION TO DISMISS IS PREMATURE, IT DOES NOT ANALYZE THE ACTUAL *NEW GIRL* SCRIPTS, AND IT MUST BE DENIED

Defendants have requested that the Court take judicial notice of the *New Girl* DVDs for the first and second seasons. (*Doc. No. 64*). Plaintiff oppose this request as improper. However, even if accepted, Defendants motion asks the Court to compare only these audiovisual works to Plaintiffs' scripts, and to have the case dismissed on that basis of that comparison. But such a request is clearly improper as it affords the Court no chance to examine the copyrighted underlying *New Girl* scripts. The defendant writers and producers of *New Girl* explicitly state in the DVD commentary that all *New Girl* episodes are *extensively* rewritten in production and shooting, (Evolution of an Episode, NG S1, Disc 3 extras at 7:17–8:20), meaning that Defendants essentially want this Court to only look at the last, most heavily edited version of *New Girl* furthest removed from the copying alleged by Plaintiffs. Defendants have placed the cart before the horse; the pertinent analysis is between the *Square One* and *New Girl* scripts, not the audiovisual works Defendants' motion to dismiss focuses on. Importantly, **if the New Girl scripts (hidden and undisclosed by Defendants) are determined to be infringing, then all New Girl audiovisual works are infringing derivative works**. 17 U.S.C. §§ 101, 103.

This motion to dismiss is thus something of a non-sequitur: the Court can only compare the *New Girl* audiovisual works to *Square One*, but the Court cannot conclude on such a comparison that there was no infringement. While Plaintiffs believe it is absolutely clear that the audiovisual *New Girl* episodes do infringe on *Square One*, Defendants' deliberate failure to bring these scripts before the Court makes their request for dismissal impossible to grant on the merits.

1     In truth, this Motion to Dismiss should never have been filed and is impossible to grant

2     under any circumstance. Defendant Meriwether wrote the first draft of *New Girl*, called Chicks

3     and Dicks, in or around October 2010. (FAC, at ¶74–75). Plaintiffs extensively referenced the

4     Chicks and Dicks script in the Amended Complaint. (FAC at ¶¶4, 6, 20, 62, 75, 76, 77, 82, 101,

5     266, 273, 282, 292, Appendix A). Any adjudication of this case therefore requires an examination

6     of the material first created by Meriwether, including *the first draft* script. The problem is that, at

7     this stage in the litigation, it is impossible for the Court to consider the first draft of the Chicks and

8     Dicks script because the first draft has not been copyrighted and cannot be judicially noticed.[6] In

9     other words, discovery is needed before any determination about substantial similarity can be

10    made. Therefore, because Plaintiffs' adequately pled that *New Girl* is substantially similar to

11    *Square One*, and because not all allegedly infringing *New Girl* scripts are before the Court, this

12    Court cannot dismiss this case on substantial similarity grounds.

13    ## II.   Motion to Dismiss Legal Standard
14

15    A plaintiff in a copyright case must show two things to prove protected expression was

16    copied: a reasonable possibility of access and substantial similarity between the works. Benay v.

17    Warner Bros. Entm't, Inc., 607 F.3d 620, 624 (9th Cir. 2010). Well-pleaded allegations in the

18    Complaint are considered true for purposes of a Fed. R. Civ. P. 12(b)(6) motion to dismiss. UMG

19    Recordings, Inc. v. Veoh Networks, Inc., 718 F.3d 1006, 1014 (9th Cir. 2013). A Rule 12(b)(6)

20    dismissal is proper only when the complaint fails to allege sufficient facts under a cognizable legal

21    theory. Id.; see also Shroyer v. New Cingular Wireless Services, Inc., 622 F3d 1035, 1041 (9th Cir.

22    2010). Importantly, under the Inverse Ratio Rule, the more evidence showing Defendants had

---

[6] It would be impossible at this juncture to authenticate which version of Chicks and Dicks is the first draft written by defendant Meriwether. This script is therefore not readily verified and cannot be judicially noticed. See Zella v. E.W. Scripps Co., 529 F.Supp.2d 1124, 1139 (C.D.Cal. 2007).

1   access to Plaintiffs' work, the lower Plaintiffs' burden is to show substantial similarity. <u>Benay</u>, 607

2   F.3d at 625.

### III.   Plaintiffs have Demonstrated with Strong Evidence that All Defendants Had Access to Plaintiffs' Work

#### a.   Legal Standard for Access

Courts are well aware that evidence of access, especially before any discovery has been conducted, is usually circumstantial in nature. <u>L.A. Printex Indus. v. Aeropostale, Inc.</u>, 2012 U.S. App. LEXIS 12033 (9th Cir. 2012) ("Absent direct evidence of access, a plaintiff can prove access using circumstantial evidence of . . . a chain of events linking the plaintiffs work and the defendant's access" (quotation marks omitted)). As a result, Plaintiffs are only required to show that Defendants had a "reasonable possibility" of access to Plaintiffs' work, not definitive proof. <u>Id.</u> Importantly, under the Inverse Ratio Rule, the more evidence showing Defendants had access to Plaintiffs' work, the lower Plaintiffs' burden to show substantial similarity. <u>Benay</u>, 607 F.3d at 625. When the Court believes similarities between two scripts are not merely a "literary accident," such a finding factors heavily into the substantial similarity determination. <u>Metcalf v. Bochco</u>, 294 F.3d 1069, 1073–74 (9th Cir. 2002). Access may also be demonstrated if the works are strikingly similar. <u>Three Boys Music Corp. v. Bolton</u>, 212 F.3d 477, 485 (9th Cir. 2000).

#### b.   Facts Proving Access

For the purpose of a motion to dismiss, all well-pled allegations in Plaintiffs' complaint are to be deemed true by the Court. Plaintiffs have pled, without the benefit of any discovery, extensive evidence showing that all Defendants had access to Plaintiffs' work:

- Defendant William Morris Endeavor solicited Plaintiffs' scripts, First Amended Complaint ("FAC") at ¶49, one its top partners and directors—Adam Venit—reviewed the script, <u>id.</u>, and **WME performed coverage of Plaintiffs' script**, <u>id.</u> at ¶¶9, 53, 269.

- Plaintiffs' producer at the time, Holly Harter, is a close personal friend of Venit, demonstrating that *Square One* was not haphazardly passed to WME then ignored; it

received serious consideration. Id. at ¶49. Defendants received all versions of *Square One* from Harter. Id. at ¶270.

- Plaintiffs' contacts with WME were not attenuated or brief, as is often seen in copyright cases where scripts are blindly mailed to a defendant who denies ever receiving it. See, e.g., Gable v. NBC, 727 F. Supp. 2d 815, 825 (C.D. Cal. 2010). **Plaintiffs in this case worked with WME for years with multiple agents and partners**. FAC at ¶48–61.

- Almost all the individual defendants who write, produce, and direct *New Girl* are represented by WME, namely defendant screenwriter Elizabeth Meriwether, defendant producer Peter Chernin, and defendant director Jacob Kasdan. Id. at ¶¶78, 129, 273, Appendix D.

- Chernin is the former President and COO of the Fox Defendants, id. at ¶130–31, and, upon leaving Fox in 2009, crafted a lucrative severance deal guaranteeing that Fox would produce Chernin's television shows, id. at ¶131.

- Chernin, after leaving Fox, selected WME as his agent. Id. at ¶64. **Chernin selected WME because of the agency's ability to channel him material and talent for the production of shows**. Id. at ¶¶63, 133. In fact, major players in the industry sign on with an agency because it has the ability to provide them with material for development. Id. Chernin's agent at WME, Rick Rosen, is WME's head of television and a partner and director with Adam Venit (who received *Square One*)—both at the very top of WME's management. Id. at ¶66.

- Given Chernin's deal with Fox, any material WME forwarded to Chernin was likely to be produced, and WME would reap the resulting benefits, including the ability to package shows. Plaintiffs allege that WME did package *New Girl*, as evidenced by the large number of cast and production members represented by WME. Id. at ¶¶118–19, 306, Appendix D.

- Meriwether, who claims to have written *New Girl*, is represented by a senior WME executive and partner, Cori Wellins, who is head of WME's television literary department. Id. at ¶68. Wellins is on Rick Rosen's team. Id. at ¶70. This means that Chernin, Fox (by and through Chernin), and Meriwether are all directly tied to the WME television management team. The person heading this team, Rick Rosen, and his subordinate Cori Wellins, are part of WME's core management with Adam Venit, who definitively received the *Square One* script. **Venit, Rosen, and Wellins had access to the coverage done of *Square One* by WME and the scripts themselves**. Id. at ¶276.

- Defendant Jacob Kasdan's agent, Phillip Raskind, has recently worked with Rick Rosen. Id. at ¶240.

- Consequently, Plaintiffs allege that all Defendants have direct access to Plaintiffs work. Id. at ¶276.

By any standard, the above facts allege far more than a reasonable possibility of access; it is undisputed WME had direct access to Plaintiffs' scripts. WME is at the center of a web of individuals and companies—including Meriwether, Chernin, Kasdan and Fox—who had direct

access to *Square One*, a fact especially transparent when considering the similarities between *Square One* and *New Girl* delineated below. Because Plaintiffs' sufficiently pled that Defendants actually had access to and copied *Square One*, and because well-pled allegations are deemed as true for the purposes of a Motion to Dismiss, this Court must examine substantial similarity under a highly deferential standard. Benay, 607 F.3d at 625.[7]

Plaintiffs' strong access argument alone demonstrates why this motion should be denied and that Plaintiffs should be afforded the chance to conduct discovery to prove their case.

## IV.   *Square One* and *New Girl* are Substantially Similar

### a.   Legal Standard for Substantial Similarity

A plaintiff seeking to prove copyright infringement must show that the defendant had "a reasonable possibility" of access to the work, and that the protected expression in the two works are substantially similar. Substantial similarity, for purposes of a motion to dismiss, is considered in light of eight factors: Plot, theme, characters, dialogue, mood, setting, pace, and sequence of events. Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994). Protected expression consists of the "specific details of an author's rendering of ideas, or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'" Metcalf, 294 F.3d at 1073–74.

Although general ideas included in a literary work are not protectable, the Ninth Circuit has held that the "presence of so many generic similarities and the common patterns in which they arise" can help satisfy the substantial similarity test by the **sheer number of general similarities between the works**. Id. If the "totality of similarities" between two characters in a work go beyond what is required for the depiction of Defendants' theme, a jury can find protected expression was

---

[7] Plaintiffs' also allege that access has been established due to the striking similarity between the scripts.

1    copied. Id. (stating that "where main characters are both well dressed, wealthy, self-assured and

2    have expensive tastes, 'the totality of these similarities . . . goes beyond the necessities of

3    [defendants' work's] theme and belies any claim of literary accident'").

4          b.   Application – *Square One* and *New Girl* are Substantially Similar

5          Defendants seek to cast the similarities between the scripts as being nothing more than

6    ideas, but at some point **the specificity with which an idea is expressed becomes protected**

7    **expression**. Metcalf, 294 F.3d at 1073–74. Take, for instance, Defendants' astonishing claim that

8    "*New Girl* and *Square One* at most share the general idea of a woman moving in with three male

9    roommates." Def. Brief, at p.16. Even a cursory examination of *Square One* and *New Girl* confirms

10   that the similarities between the *Square One* and *New Girl* are rather more specific than

11   Defendants' deliberately obtuse characterization. Plaintiffs simply are not claiming copyright

12   infringement because Defendants created a story about a girl moving in with three guys; Plaintiffs

13   are claiming copyright infringement because *New Girl* and *Square One* share an incredible number

14   of similarities so specific that they must have been copied from Plaintiffs' work. There is, of course,

15   no bright line delineating when the specificity with which an idea is expressed becomes protected

16   expression, but Plaintiffs submit to the Court that it is a determination, in this case, that can only

17   be done by a jury.[8] To that end, they ask the Court to view the video analysis Plaintiff prepared,

18   attached as Exhibit A. An analysis of the eight factors, primarily focusing on the first and second

19   episodes of *New Girl*, follows:

20

21

_____

[8] Plaintiffs stress that they are at a disadvantage because they must compare a written script to a professionally produced television show with quality actors and actresses. To better illustrate Plaintiffs case, they have attached video comparisons of *Square One* scripts to *New Girl* scenes.

1                           **(1)**        **Plot and Sequence of Events**

2         The plot of *New Girl* as compared to *Square One* contains specific similarities so numerous

3 that it is all but impossible to conclude defendant Meriwether wrote this script without reading and

4 copying Plaintiffs' scripts.

5         **First**, the broad plot points and arcs of the works are identical. In each work, a young

6 woman finds out that her soon-to-be ex, named Spencer, is cheating on her, which causes her to

7 move into a bachelor pad with three male roommates to start a new life. In each work, the young

8 woman has a best friend, named Cat Cook (C.C.) or CeCe, who helps her through her break up

9 and the new life she forges for herself. In each work the story is advanced by the interactions and

10 banter of the three roommates and Jess/Greer. In each plot, there is a pessimistic roommate who

11 bartends at a local bar. In each plot, it is apparent that that the bartender roommate is interested in

12 the main character, Greer/Jess. In each plot, the main character is sexually inexperienced and the

13 plot explores the main character's process of sexual exploration. In each plot, the bartender

14 roommate and the main character slowly begin to fall for each other and eventually wind up kissing.

15 Card 16 (Sq1 2008, at p.114; NG, Ep1: 20:33–21:07).

16         **Second**, the specific plot points of the first few episodes of *New Girl* are highly similar to

17 the plot of *Square One*; these are also the episodes that defendant Meriwether is credited as writing

18 or had the most input. The Court must ask itself, per Metcalf, if the following similarities are

19 plausibly the result of literary accident:

20         Each work begins with a discovery of infidelity. In *Square One*, Greer does an out-of-

21 character strip tease immediately after finding out that her husband, Spencer, is cheating on her,

22 (Sq1 2006, at p.2), while in *New Girl*, Jess is doing an out-of-character strip tease when she finds

23 out that her boyfriend, Spencer, is cheating on her. (NG Ep1, at 1:00–43); see also Card 2. In both

stories, the discovery of infidelity is told in a flashback. (Sq1 2009, at p.2; NG, Ep1: 0:27–1:50). In both stories, the main character reaches out to her best friend by phone immediately before or after the break up: After Greer discovers Spencer is cheating she immediately reaches out by phone to her best friend, Cat Cook (C.C.), for guidance and comfort. (Sq1 2009, at p.3). Immediately before Jess finds out Spencer is cheating, Jess reaches out on the phone to her best friend, CeCe, for guidance. (NG Ep1, at 0:20–1:00).[9] In both stories this discovery by Greer/Jess of Spencer's infidelity is the catalyst that causes the protagonist to abruptly drop her entire life and move in with the three guy roommates. (Sq1 2009, at p.1–3; NG, Ep1: 0:27–1:50).

In both works, immediately following Greer/Jess's decision to leave Spencer, the bachelor pad is the next scene with the main character being introduced to the guys. (Sq1 2009, at p.3–4; NG, Ep1: 1:46–52). In both works, the large TV and L-shaped couches are identified as the focal points of the living space. (Sq1 2009, at p.3; NG, Ep1: 1:46–52, Ep2). As both characters acclimate to their new surroundings and roommates, they are consumed with depression about the break up with Spencer. In both works Greer/Jess lie on the couch, watching the TV, consuming large amounts of junk food. Card 4 (Sq1 2009, at p.10; NG, Ep1: 5:31–45). In both scripts, the protagonists' friends and roommates stage an intervention of sorts to convince Greer/Jess to break out of her funk. (Sq1 2009, at p.10–11; NG, Ep1: 6:29–7:23). In both works, the best friend, Cat Cook/CeCe, comes over to the bachelor pad to help Greer/Jess cope with the break up. (Sq1 2009, at p.10–11; NG, Ep1: 16:41–17:03). In both works Greer/Jess left in such a hurry that it is necessary for her to borrow the clothes of her new roommates. Card 5 (Sq1 2009, at p.2, 5; NG, Ep1: 3:03–23, 4:14–21). In both works, Greer/Jess cook for the roommates soon after she moves in even

---

[9] In *Square One*'s 2007–09 versions, the strip tease is shifted to later in the story. See, e.g., (Sq1 2009, at p.47).

though that is not "her thing," because she wants to fit in with the guys and play the "mother hen." Card 13 (Sq1 2009, at p.14; NG, Ep1: 1:37–53, 2:22–23).

In both *Square One* and *New Girl*, all the roommates decide that Greer/Jess needs to go to the bar with them as either an initiation, (Sq1 2009, at p.23–24), or rebound experience (NG, Ep1: 6:33–44, 10:17). In both works, the roommates take her to the bar where the bartender roommate works. (Sq1 2009, at p.24–25; NG, Ep1: 10:21–15:06). In both stories Greer/Jess going to the bar with her roommates is a key bonding experience between the roommates.

In both *Square One* and *New Girl* following the bar outing, Greer/Jess finds herself still thinking it could work with Spencer, or still having feelings for him. In both works, it is the bartender roommate, Ben/Nick, who tells Greer before she goes back to Spencer that her relationship with Spencer is over, she just needs to realize it. Card 6 (Sq1 2009, at p.30; NG, Ep2: 10:55–11:18).

In *Square One*, Greer actually gets back together with Spencer for a short time, although she is still unhappy and uncertain about the relationship. (Sq1 2009, at p.30–35). In *New Girl*, Jess goes to Spencer's to get her stuff back, but once there finds herself still missing him. (NG, Ep2: 14:37–14:54). However, Greer/Jess quickly realizes that Spencer has not changed and is still the same guy who hurt her before. (Sq1 2009, at p.45–46; NG, Ep2: 14:54–19:01). Following this realization, Greer drags most of Spencer's stuff onto the front lawn of their house and proceeds to set it on fire where a group of people, including Cat Cook, look on. Card 7 (Sq1 2009, at pp.47–48). Following this realization in *New Girl*, Jess drags most of her stuff onto the front lawn of the house while her roommates, including her best friend CeCe, look on. Card 7 (NG, Ep2: 14:59–15:18, 17:25–45, 18:25–40). In both scripts, as a crowd looks on, Greer/Jess confronts Spencer on the front lawn and leaves him for good. Card 7. After the confrontation, both best friends, Cat

Cook/CeCe, make sarcastic comments to Spencer indicating they are glad that the relationship is finally over. Id.

Given that *Square One* is a feature length script and focuses on a single story line, and *New Girl* is a television with many episodes comprising the overall plot, the most specific plot similarities between *Square One* and *New Girl* occur in the first several episodes. Again, these are the episodes that Elizabeth Meriwether allegedly conceived and wrote, namely the Pilot and Kryptonite. The broader plot similarities, noted above, continue throughout the show.

**(2)     Theme**

The primary and secondary themes shared by *Square One* and *New Girl* effectively illustrate that it is not only an "idea"—a girl and three guys living together—that is shared between the two works. Both works are advanced by substantively identical emotional and symbolic themes that show there is no way *New Girl* was independently created.

**Group of Friends Relying on Each Other.** The primary theme is that a girl is spurred to move in with three guys by a traumatic break up with a guy named Spencer who cheated on her. The roommates, although initially strangers, soon bond and come to rely on each other. Much of both works concern the interaction of the roommates as they help each other confront life challenges. In addition, the protagonist's best friend plays a crucial role in supporting her throughout each work. This primary theme, the group dynamic, undergirds and tells the story.

**Rite of Passage/Break with the Past.** Both *Square One* and *New Girl* are about heroines who experience a "rite of passage" that leads toward their own self-acceptance. Both stories are about a young, awkward woman in her early 30s who discovers her husband/ long-term boyfriend, named Spencer, has cheated on her. Both main characters' lives then change overnight when she chooses to abandon her old life in favor of an unknown life as single woman. Her new life now

includes figuring out how to live with three distinctly different male bachelors whom she does not know personally. In both works, the heroine of the story is at first, sad and depressed about the sudden break up and not happy about walking away from the comfortable life she knows. Both women's exes are men who do not value these women. Their exes are both patronizing and condescending to these heroines.  In addition, both men seem to be an ideal match for each heroine in her idealized world. But now, both women realize that her life up until this point has been a lie—one revealed by her exes' backstabbing infidelity.

Both women, with the help of her new roommates, slowly rebuild their self-esteem and venture head first into creating a new life. Both women are at first relatively alone, with few belongings, relying on the roommates for help and even clothing. In addition to the roommates, both women rely heavily on her best friend to guide her through this time, and acclimate to life with the guys. After just a short time in her new life with their roommates, both women have the courage and confidence to face their ex-husband/ long-term boyfriend, in large part because of the roommates' encouragement. One heroine decides to burn her ex's clothes on the front law, while the other goes on a tear through her old house and drags her belongings out onto the front lawn. Each woman dramatically confronts her ex on the front lawn and permanently leaves him in front of a crowd of people.  The symbolism behind these public and emotional separations in both stories is identical—a clean and cathartic cut—and the finality of these separations play a crucial role in launching the rest of the protagonists' life.

**Greer/Jess Overcoming Awkwardness.** In both stories, the way the main character is presented revolves around how each protagonist is awkward in their own skin and uncomfortable dressing in an attractive way. Moreover, in both works, Greer/Jess's clothing and awkwardness are treated as obstacles to be overcome. In one scene of both stories, Jess/Greer dons a tightfitting

dress before a party and lets her hair down, showing the look to Keegan/Schmidt and Ben/Nick. Card 14 (Sq1 2009, at p.53–54; NG Ep3, 1:34–43). Notably, the tertiary JC/Winston character is absent in both scripts. Keegan/Schmidt and Ben/Nick's reactions to Greer/Jess's new look are highly similar in each script, with Keegan and Nick both looking surprised and exclaiming "Wow!", an acknowledgement that she is breaking out of her shell. Id. In another scene, both Greer and Jess are told they need to change their look by a female friend and are given a sort of makeover. After this makeover they are presented to the guys as their new, hotter roommate. Card 8 (Sq1 2009, at p.70–71; NG Ep1, 17:27–58). As can be seen in Card 8, the way in which each girl is presented to her roommates is nearly identical. Cementing the similarity of the scene are the reactions of the roommates which include stunned admiration, cat calls, and a high level of interest with a lingering stare from the pessimistic bartender roommate. Id.

**Greer/Jess Getting Past Sexual Inexperience.** Not only are both protagonists portrayed as awkward and unaware of their attractiveness, these women are both sexually inexperienced, having only ever had sex with their ex. The role of sex, and how to approach without fear and apprehension, is a critical thematic ingredient to telling both *Square One* and *New Girl*. The sexual inexperience of the main character is very specific component to add to a story and discredits the notion that such a thematic element was independently created by Plaintiff. Both stories heavily emphasize the main character's desire to break out of her sexually repressed shell, evidenced by the purely sexual relationships both characters seek. Casual, noncommittal sex is a first for both characters since in her old life, sex and a relationship could not be separated.  In both stories, she gets the confidence and encouragement from her roommates, who, as men, know how to separate sex and a relationship, as well as from her sexually confident best friend.

1    **Greer/Jess's Slowly Developing Relationship with Pessimist Roommate.** Ironically, as

2    each heroine becomes comfortable in her own skin, each woman finds herself inexplicably attracted

3    to her pessimist roommate who pushes her the most. This is not the normal "type" for either of

4    these heroines. In fact, both women at first deny any attraction to her slacker roommate, even when

5    her best friend in each piece sees the attraction first. This slowly developing relationship

6    undergirds both shows and is a crucial element.

7    By interacting with each of her roommates individually and as a group, the main character

8    is able to learn more about herself, date again, and ultimately find the courage she needs to accept

9    herself for who she is—a person not accepted or respected by her past husband/ boyfriend, but one

10   her roommates truly love and support.

11   ### (3)   Characters and their Relationships

12   In Metcalf, the Ninth Circuit is clear that if the "totality of similarities" between two

13   characters in a work go beyond what is required for the depiction of Defendants' theme, a jury can

14   find protected expression was copied if Defendants viewed Plaintiffs' work. Metcalf, 294 F.3d at

15   1073–74. Defendants view the theme of *New Girl* as "that time when four people just sort of found

16   each other and the planets align, and they needed each other at that time, and are trying to figure

17   out who they are, and they're each making each other better and challenging each other." Dave

18   Finkel, Evolution of an Episode (NG S1, Disc 3 extras at 0:41–55). The Court must therefore ask

19   itself if the voluminous similarities between *Square One* and *New Girl*'s characters, are

20   "necessary" to depict that theme. For instance, was it necessary to have Jess move into a bachelor

21   pad with three guys after she got cheated on by a guy named Spencer, was it necessary to depict

22   Jess as sexually inexperienced, was it necessary to depict both as having trouble presenting

1       themselves attractively, was it necessary to have sexual tension develop between the pessimist

2       bartender and Jess? The character similarities are elaborated on below:

| SQUARE ONE | NEW GIRL |
|---|---|
| **Greer McIntyre** | **Jessica "Jess" Day** |
| • 30s, in the process of divorcing husband<br>• Optimist who is a "glass half full" gal<br>• Doesn't always fit in and is concerned about her looks<br>• Greer alludes to the fact that she's only been with Spencer / doesn't have a lot of sexual experience<br>• Greer is not excited about new life with guys (depressed right after she moves in b/c of her breakup)<br>• She has her own style that is feminine<br>• Greer attempts to cook and be domestic for the guys even though that is not her thing. <u>Card 13</u>.<br>• Greer uses outdated phrases "I'm not a lady of the night"<br>• She has a close relationship with her parents, her dad is protective of her – drives her back up to the bachelor pad | • 30s, just break up with long-term boyfriend<br>• Overly optimistic/ sings to herself<br>• She's had a hard time fitting in even as a kid– a dork – hence the phrase "adorkable"<br>• Sexually inexperienced – Jess has been with Spencer six years and would have married him.<br>• Feminine<br>• Jess attempts to cook and be domestic for the guys even though that is not her thing. <u>Card 13</u>.<br>• Uses outdated phrases trying to be cool "Hello, Sailor."<br>• Jess cries on the couch right after she moves in with the guys<br>• In pilot episode, she's on with her mom and in later episodes she is close with her parents |
| **Spencer McIntyre** | **Spencer** |
| • Greer's ex-husband (long-term relationship)<br>• Dismissive, disrespectful, inattentive to Greer<br>• Greer alludes to fact she hasn't been with a lot of men | • Jess's ex-boyfriend, long-term, committed relationship (6 years). Jess tells him she would've married him<br>• Dismissive, disrespectful, inattentive of Jess |
| **Keegan** | **Schmidt** |
| • Roommate -20s, good-looking<br>• Out-of-shape football player build<br>• He's the lovable narcisist whose lack of self-confidence is masked with over masculinity <u>Card 10</u>.<br>• He constantly draws attention to himself<br>• He is kept in check by the other roommates on what is appropriate<br>• Talks and acts before he thinks because he's only thinking about himself<br>• Underneath it all, he is a softie<br>• Greer helps Keegan's confidence<br>• Greer and Keegan have a brother/ sister type of relationship<br>• Keegan first of guys to take care of Greer & calls Greer's brother who sends Cat | • Roommate – "mid 20s, slick button up shirt"<br>• Was out of shape/fat in college but now is in great shape and is obsessed with his appearance<br>• Loveable narcissist who has a lack of self-confidence masked by being overly masculine. <u>Card 10</u>.<br>• He loves to draw attention to himself<br>• The other roommates have a "douchebag jar," and keep his over the top behavior in check<br>• He is emotionally immature<br>• At his core, he is still deeply insecure<br>• He and Jess have a brother/ sister relationship<br>• Schmidt first of guys to help Jess by asking to go out with them, he'll be her wingman, and watches TV with her |

| **Ben -** | **Nick Miller** |
|---|---|
| • Bartender roommate who is a pessimist. Card 12. <br> • Bartends at the local hangout <br> • Pessimist who has given up on his life and accepted his circumstances, doesn't have a lot of drive <br> • He chides the other roommates a lot and is the keystone of the group <br> • He has a sense of self even though he's settled for a mediocre life <br> • He is harder on Greer than the other guys <br> • He is the roommates who is interested in Greer throughout the story. They eventually get together. | • Bartender roommate, a pessimist and kind of a deadbeat. Card 12. <br> • Bartends at the roommates local hangout <br> • Pessimist to Jess' optimist <br> • Gives Jess a hard time, but turns out to be the one she confides in the most <br> • Chides Schmidt when he's acting like a "douche," and is the keystone of the group. <br> • He is the roommate harder for Jess to win over <br> • He is the roommate who interested in Jess throughout the story. They eventually get together. |
| **JC** | **Coach/WINSTON (Replaced after New Girl Pilot)** |
| • Of the three roommates, he has a tertiary role <br> • He is an athletic fitness coach <br> • He has trouble connecting with his girlfriend and seeks Greer's help <br> • He is the most private of the three roommates | • Of the three roommates, he has a tertiary role <br> • Coach had trouble talking to women and sought Jess out in the pilot episode. <br> • Winston is an athlete |
| **Cat Cook** | **CeCe** |
| • Greer's best friend and confidante <br> • She is sexually confident and a bit of a firecracker <br> • She is married and has kids <br> • She does not like Spencer and lets him know it | • Jess's best friend and confidante <br> • She is a model, sexually confident, and very upfront <br> • She does not like Spencer and lets him know it |

1
2     **Character Relationships**

| SQUARE ONE | NEW GIRL |
|---|---|
| **Greer and Spencer** | **Jess and Spencer** |
| • Married. His infidelity leads to her new life living with 3 friends of her brother who she barely knows <br> • When we meet Spencer, he is disrespectful and dismissive of her <br> • Greer does not fit into this old life <br> • Greer tells Spencer off in front of their house, on front lawn, in front of Greer's neighbors and Cat <br> • Burning his clothes and their personal things in the front yard, symbolizes her decision to end their relationship for good. There's no turning back to her new life with the bachelor's now. | • 6 year, long-term relationship <br> • When Jess catches him with another woman she decides to move in with 3 random guys <br> • Spencer is dismissive and disrespectful of her – he doesn't listen to her or appreciate her. <br> • Jess goes to face Spencer to get "her stuff", including her TV since she broke Nick's <br> • She ends their relationship for good when she throws their plant she had on their front porch – "I told you to water the plant" – this symbolizes her ending the relationship for good. Her relationship with Spencer is as dead as the plant. <br> • She doesn't care that she gives her break up speech in front of her roommates and CeCe |

| | |
|---|---|
| • She gives her final break up speech to him in the front yard of the place she and Spencer shared together.<br>• She doesn't care that her break up speech is done in front of the neighbors or her friends. | |
| **Greer and Ben**<br>• Ben takes a while to warm to Greer<br>• He's cautious about her<br>• He's the pessimist to her optimist<br>• They are open with each other and very frank with each other<br>• They bait each other constantly, like an old married couple.<br>• Cat suspects that he likes her, Greer denies it. <u>Card 15</u>.<br>• There's sexual tension between the two, Ben becomes a love interest<br>• Bens' not the typical romantic lead – he doesn't have a good job, not ambitious but since Greer isn't looking for a man to complete her, she's open to him<br>• He tells Jess not to get back with Spencer | **Jess and Nick**<br>• Nick takes a while to accept Jess<br>• He is standoffish with her at first<br>• He is grumpy and lacks ambition<br>• He finds her a little ridiculous and is often exasperated with her antics<br>• CeCe tells Jess that she thinks Nick is into her, Jess denies it. <u>Card 15</u>.<br>• They become love interests, and there's sexual tension between them from the first episode<br>• He tells Jess that she has to end it with Spencer. |
| **Greer and Keegan**<br>• Keegan is the first to help Greer by calling her brother to send Cat when Greer is depressed after the breakup<br>• In return, Greer helps Keegan by being his "wingman" at a company party<br>• Greer and Keegan are comfortable hanging out together.<br>• When Greer comes home to tell Keegan she got a promotion and he's excited for her, she tells him<br>• Greer / Keegan platonic / brother – sister relationship – give and take advice from each other | **Jess and Schmidt**<br>• Schmidt is the first to approach Jess and befriend her by asking her to sit up from the couch and invites her to go out with them<br>• Schmidt helps Jess and gives her dating advice/ how to get rebound sex<br>• Very comfortable together – he stays with Jess instead of going out with the guys to watch Curly Sue<br>• Jess/ Schmidt have a platonic/ brother sister relationship –they give and take advice from each other |
| **Greer and Cat Cook (C.C.)**<br>• Greer's best friend from childhood<br>• Cat can have an authoritative tone with Greer as women do when they've been friends for so long<br>• Cat is protective of Greer like a big sister would be<br>• Cat understands and supports Greer and gives her advice on sex. <u>Card 9</u>.<br>• Cat's life is more stable than Greer's<br>• After Greer breaks up with Spencer on the front lawn, Cat pats Spencer on the back | **Jess and CeCe**<br>• Jess' best friend from childhood<br>• CeCe is protective of Jess and understands her when others do not<br>• CeCe gives Greer advice on sex and life. <u>Card 9</u>.<br>• Jess is way more impulsive than CeCe<br>• Cece has her life more together than Jess<br>• Cece end of S2 wants to get married/ settle down<br>• After Jess breaks up with Spencer on the front lawn, Cece tosses Spencer a bell from Jess's bike – "Keep the bell." <u>Card 7</u>. |

| "Was it good for you, because it was good for me." <u>Card 7</u>. | |

#### (4)   Setting

Both *Square One* and *New Girl* incorporate the same primary and secondary settings in the first few episodes of *New Girl* most similar to *Square One*. The first major similarity is that both works take place in the bachelor pad, primarily in the living room. The living room in both works is furnished with an L-shaped couch, an oddly specific piece of furniture, and a large screen television. In *Square One* the large screen television is described as the "piece de resistance," (Sq1 2009, p.3), while in *New Girl* the second episode, "Kryptonite," is partly about the importance of the roommate's large screen television.

The second major similarity is the setting of a pivotal scene, Greer/Jess's public confrontation with Spencer, that takes place in the front yard of Spencer's house. Both protagonists give their "stand up for themselves" speeches to their exes and do this in front of friends. The location of this event is important as it shows the protagonists' will to completely end their poisonous old relationships and commit to their new lives.

The third is that Greer visits a pawn shop to sell her wedding ring, while Jess visits a pawn shop in the second episode in an attempt to find a new television.

#### (5)   Mood/Pace

Although *Square One* is a feature length screenplay, and *New Girl* is a television show, something that can distort pace and mood similarities, there are nonetheless noticeable similarities between the shows. When focusing on the first two episodes of *New Girl*, the mood and pace is quite similar as Greer/Jess hurriedly moves into the bachelor pad with almost no personal belongings. She is at first depressed from her break up with Spencer. Greer/Jess then begins to

reassert herself with her roommates, and both works explicitly identify that the time spent with the roommates is several weeks. (Sq1 2009, at p.29; NG Ep2). However, during this time the lack of a clean break looms large over both Greer and Jess. After those first several weeks, Greer and Jess are forced to confront Spencer and to end his involvement in their life. The mood and pace of the first two episodes of *New Girl* thus precisely mirrors analogous parts of *Square One* and support a finding of substantial similarity.

(6)    **Dialogue**

In the scene when Greer/Jess presents herself in a tight dress, the roommates react in a very similar way. <u>Card 14</u>. In the scene when Jess is presented to her roommates as her hotter self, the roommates in both works reach in very similar ways. <u>Card 8</u>. In the beginning of both works both characters lament, as the result of Spencer cheating, that their life is a lie. <u>Card 3</u>.

## V.   Plaintiffs' Breach of Contract Claim is not Barred by the Statute of Limitations for Equitable Reasons

Defendants only argue that Plaintiffs' breach of contract should be dismissed on statute of limitations grounds and therefore Plaintiffs only respond on that basis. For implied contracts, such as the one pled in the First Amended Complaint at ¶¶320–24, the statute of limitations in California is two years from when the idea is first exploited. <u>NBC Universal v. Superior Court</u>, ____ Cal.App.4th _____ (2014). Although *New Girl* was first exploited in September 2011, more than two years before Plaintiffs filed their breach of contract claim, the statute of limitations should be tolled for equitable reasons, or defendants should be estopped from arguing the statute of limitations. The "application of the doctrine of equitable tolling requires timely notice, and lack of prejudice, to the defendant, and reasonable and good faith conduct on the part of the plaintiff." <u>Addison v. State</u>, 578 P.2d 941 (1978). Estoppel requires "(1) the party to be estopped must know

the facts; (2) the party must intend that his or her conduct will be acted on, or must act in such a way that the party asserting the estoppel had the right to believe that the conduct was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) that party must rely upon the conduct to his or her detriment." See <u>Ashou v. Liberty Mutual Fire Ins. Co.</u> 138 Cal.App.4th 748, 766–767 (2006). Plaintiffs have acted in good faith throughout this action and did not sit on their rights. Furthermore, Defendants have been on notice that this action was likely to be filed since mid-2011.

In early-to-mid 2011, after learning about *New Girl*, Plaintiffs retained attorneys who contacted Defendants and notified them that *New Girl* was infringing. FAC at ¶¶91–101. Shockingly, Plaintiffs were told by their then attorneys that their firm ***represented defendant Jacob Kasdan***, but that there was no conflict issue because Plaintiffs' then-attorneys convinced Plaintiffs that Kasdan—who directed the infringing show and was repped by defendant WME—should not be viewed as complicit in the theft of their work. <u>Id.</u> at p.26 n.9. For the next year, well into February 2012, those attorneys negotiated back and forth with Defendants in an attempt to resolve the matter amicably. <u>Id.</u> at ¶¶91–101. Defendants even made an insulting settlement offer of $10,000 to obtain Plaintiffs' silence on this matter, which Plaintiffs' firm encouraged them to take. <u>Id.</u> As Plaintiffs continued to work with the firm, it became increasingly apparent in February 2012 that, for whatever reason, the firm was not serious about aggressively prosecuting the case; the firm was then terminated. As Plaintiffs sought new counsel, they did not know their breach of contract claim would run afoul of the statute of limitations. Therefore, because Plaintiffs did not sit on their breach of contract claim, because Defendants were well aware of the claims against them, and because their prior counsel astonishingly represented some of the defendants on this

1    case, equitable tolling for the period Plaintiffs retained their former counsel, March/April 2011 to

2    February 2012, should be added to the statute of limitations, estoppel should apply.

## VI.   CONCLUSION

Plaintiffs therefore advance three primary grounds for denying this Motion to Dismiss:

(1)   Defendants' motion to dismiss completely ignores the actual *New Girl* scripts, focusing entirely on the audiovisual derivative works

(2)   Defendants' motion largely ignores access and its relationship to substantial similarity under the inverse ratio rule; and

(3)   It is clear that *Square One* and *New Girl* are substantially similar no matter what standard or material is used.

Respectfully submitted,

FRANCIS ALEXANDER, LLC

*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Rd. | Suite 105
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
E:  francis@francisalexander.com
*Pa. Supreme Court ID No.: 208494*

*Law Firm / Lawyer for Plaintiffs*

*/d/ June 16, 2014*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing RESPONSE TO DEFENDANTS' MOTION TO DISMISS have been served upon all counsel of record via electronic filing or U.S. Mail on the date below.

David A. Grossman, Esquire
LOEB & LOEB LLP
10100 Santa Monica Blvd. Suite 2200
Los Angeles, CA 90067
T: (310) 282-2077
F: (310) 919-3943
*Attorney for defendants Elizabeth Meriwether, Elizabeth Meriwether Pictures, Twenty-First Century Fox, Inc., Fox Entertainment Group, Inc., Twentieth Century Fox Film Corporation, Twentieth Television, Inc., Twentieth Century Fox Int'l Television, Inc., Twentieth Century Fox Home Entertainment, LLC, Fox Network Group, Inc., Fox Broadcasting Company, Fox Television Stations, Inc., Fox International Channels, Inc., Peter Chernin, Chernin Entertainment LLC, The Chernin Group LLC, Jacob Kasdan, American Nitwits, David Finkel, and Brett Baer*

Jonathan Zavin, Esquire
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
T: (212) 407-4000
F: (212) 407-4990
E: jzavin@loeb.com
*Attorney for defendants Elizabeth Meriwether, Elizabeth Meriwether Pictures, Twenty-First Century Fox, Inc., Fox Entertainment Group, Inc., Twentieth Century Fox Film Corporation, Twentieth-Century Fox Television, Inc., Twentieth Television, Inc., Twentieth Century Fox Int'l Television, Inc., Twentieth Century Fox Home Entertainment, LLC, Fox Network Group, Inc., Fox Broadcasting Company, Fox Television Stations, Inc., Fox Digital Media, and Fox International Channels, Inc.*

Eric B. Schwartz, Esquire
LOEB & LOEB LLP
10100 Santa Monica Boulevard Suite 2200
Los Angeles, CA 90067
T: (310) 282-2000
F: (310) 282-2200
E: eschwartz@loeb.com
*Attorney for defendants Elizabeth Meriwether, Peter Chernin, and Jacob Kasdan*

1  Michael J. Kump, Esquire
2  Gregory P. Korn, Esquire
3  KINSELLA WEITZMAN ISER KUMP AND ALDISERT LLP
4  808 Wilshire Boulevard 3rd Floor
5  Santa Monica, CA 90401
6  T: (310) 566-9800
7  F: (310) 566-9850
8  E: mkump@kwikalaw.com
9  E: gkorn@kwikalaw.com
10  *Attorneys for defendant William Morris Endeavor Entertainment, LLC*

11

12                                   **\*\*\*\*\***

13                                   *Respectfully submitted,*

14                                   FRANCIS ALEXANDER, LLC
15                                   /s/ Francis Malofiy
16                                   280 N. Providence Rd. | Suite 105
17                                   Media, PA 19063
18                                   T:  (215) 500-1000
19                                   F:  (215) 500-1005
20                                   E:  francis@francisalexander.com
21                                   *Law Firm / Lawyer for Plaintiffs*
22                                   *Pa. Supreme Court ID No.: 208494*

23

24                                   */d/ June 16, 2014*

25